UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

COY KLINGER,

Defendant.

Docket No: 1:14-CR-233

FILED
HARRISBURG, PA

APR - 2 2021

PER _____
DEPUTY CLERK

DECLARATION IN SUPPORT OF MOTION
FOR SENTENCE REDUCTION UNDER
18 U.S.C. § 3582(c)(1)(A)

COY KLINGER, of sound mind and full age,

declares the truth of the following under the penalties

of perjury contained in Title 18 of the U.S Code:

1. I am the Defendant in the above-captioned

matter. I proceed Pro Se and I am untrained in

the science of law. I would ask the Court to

give this submission a liberal construction (and

to raise the strongest arguments suggested.

Haines v. Kerner, 404 U.S. 519, 520-521

(1)

(1972)(per curiam). I have been rendered indigent

by the Government's prosecution and I cannot afford

learned counsel.

2. I make this Declaration in support of the

instant motion for sentence reduction pursuant to

18 U.S.C. § 3582 (c)(1)(A), as amended by the

FIRST STEP ACT.

3 I am a carceral person committed to the

custody of the United States Attorney General and

housed at the facility: LOW SECURITY CORRECTIONAL

INSTITUTION- ALLENWOOD (LSCI-Allenwood), in White Deer,

Pennsylvania, a facility administered by the Federal

Bureau of Prisons (BOP)

4 Since March, 2020, LSCI - Allenwood has been

under restrictive MODIFIED OPERATIONS LOCKDOWN

due to the COVID-19 pandemic, and additional

total LOCKDOWN events have characterized my    ②

prison term.  See the attached EXHIBIT "A".

5. A neuro virus caused total quarantine LOCKDOWN

on the LSCI-Allenwood Compound from January -

February, 2020, followed by additional TOTAL

LOCKDOWN Events, the most significant of

which was the COVID-19 OUTBREAK on

the LSCI-Allenwood Compound From December

2020 to February, 2021.

6. Based on the BOP's "Action Plan" inmates

have been placed on restrictive Modified Operations

LOCKDOWN.  See the attached EXHIBIT "B".

As a result of these onerous restrictions,

I have experienced a prison term far harsher

than was contemplated by the Court at

Sentencing, as discussed infra. As a result

of these Modified Operations, I have not had

meaningful access to the Education Department and the    ③

typewriters there that are used for the production
of legal writs. As such, I beg the Court's
indulgence for this hand-written submission.

7. The district courts have broad discretion to
grant relief under § 3582(c). See United States v.
Pawlowski, 967 F.3d 327, 330 (3d Cir. 2020);
United States v. Weatherspoon, 696 F.3d 416 (3d
Cir. 2012)

8. Relief under 18 U.S.C. § 3582(c)(1)(A) has
four components: (1) Jurisdiction; (2) extraordinary and
compelling reasons; (3) dangerousness under 18 U.S.C. § 3142(g);
and (4) the 18 U.S.C. § 3553(a) factors. Upon
consideration of these components, as will be
discussed in turn, infra, the Court should
grant sentence reduction pursuant to 18 U.S.C
§ 3582(c)(1)(A).

(4)

## JURISDICTION

9. Preliminarily, the Court must determine whether I have exhausted my administrative remedies and the statutorily prescribed time period has passed.

10. A prisoner exhausts his administrative rights when the BOP fails to bring a motion for compassionate release on his behalf and he exercises all administrative rights to appeal, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A)

11. I have exhausted my administrative remedies and the Court has jurisdiction to hear the merits of this motion because I sent a request to the Warden of LSCI-Allenwood requesting sentence reduction on January 25, 2021, and that request was rejected by the Warden on January 29, 2021 ⑤

See the attached EXHIBIT "C". Thirty days have passed since my submission to the Warden, so the instant application is timely.

## A COMBINATION OF EXTRAORDINARY AND COMPELLING REASONS WARRANT MY SENTENCE REDUCTION UNDER 18 U.S.C §3582(C)(1)(A)

12. I advance a combination of extraordinary and compelling reasons that warrant my sentence reduction under 18 U.S.C. §3582(c)(1)(A), including the harsh conditions of my prison term, my overly-long prison sentence driven by a mandatory-minimum, and my significant prison rehabilitation.

13. Though the Third Circuit has yet to unequivocally rule on the issue, I take the legal position that U.S. Sentencing Guidelines §1B1.13 and its application notes are inapplicable to inmate-made motions under 18 U.S.C. §3582(c)(1)(A). This is the consensus position of all the United States ⑥

Circuit Courts of Appeals that have ruled on the issue. United States v. Brooker, 976 F.3d 228 (2d Cir. 2020); United States v. McCoy, 981 F.3d 271 (4th Cir. 2020); United States v. Jones, 980 F.3d 1098 (6th Cir. 2020); United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020)

14. U.S.S.G. § 1B1.13 has not been amended in response to the enactment of the First Step Act, and that policy statement is thus inapplicable. In Jones, Judge Easterbrook noted that ANY decision is "consistent with" a nonexistent policy statement. 980 F.3d at 1098.

15. Accordingly, my legal position is that in reviewing a compassionate release motion brought by a prisoner, district courts are free " to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them" and ⑦

are not bound by Sentencing Guidelines § 1B1.13

or its application notes. *Brooker*, 976 F. 3d at 237.

16. Writing for the Second Circuit in *Brooker*,

Judge Calabresi said:

> It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place. Beyond this, a district court's discretion in this area — as in all sentencing matters — is broad. *See United States v. Cavera*, 550 F. 3d 180, 188 (2d Cir. 2008) (en banc) (noting a district court's "very wide latitude" in sentencing. The only statutory limit on what the court may consider to be extraordinary and compelling is that "[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason. 28 U.S.C. § 994(t). *Id.* at 236

17. The Third Circuit has recognized this

"wide latitude" in *Pawlowski*, cited *supra*.

18. Accordingly, the Court is free to consider

⑧

reasons separate from or in addition to matters of poor health, age, and family care needs when assessing extraordinary and compelling reasons for sentence reduction under 18 USC §3582(c)(1)(A).

19. One reason I advance in support of my motion is that the Onerous restrictions imposed by The BOP in response to the COVID-19 pandemic have rendered my prison term unduly harsh and much more punitive than the Court ever could have intended at Sentencing.

20. Onerous TOTAL LOCKDOWN quarantine restrictions were imposed on all inmates at LSCI-Allenwood due to a new virus outbreak in January - February, 2020.

21. On March 13, 2020, The BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan (The "Action Plan") in order to minimize the risk of COVID-19 transmission

(9)

into and inside its facilities. The Action Plan, and its subsequent iterations, have been severely onerous and as a result have created harsh prison conditions that are not set to abate any time soon.

22. According to public health experts including Dr. Fauci, I am at risk from the new, more transmissible, more virulent and deadlier COVID-19 variant strains. See the attached EXHIBIT "D". Recent research shows that both previous COVID-19 infection and vaccination are, in many cases, ineffective to guard against these deadlier variants, thus debunking the concept of "acquired immunity" advanced in some earlier COVID-19-related applications under 18 U.S.C. § 3582(c)(1)(A), causing apparent embarrassment for district courts. See United States v. Garcia, No. 4:14-CR-3025, 2020 WL

⑩

4430652, at *1 (D. Neb. Jul. 31, 2020) (recognizing the scientific "unknowns" and yet still advancing a theory of "functional immunity" that has since been debunked by science), United States v. Kim, No. CR 13-303, 2020 WL 3213312, at *3 (D. Haw. Jun 15, 2020).

23. Additionally, I have been suffering from complications since contracting an early strain of the COVID-19 in January, 2020, when LSCI-Allenwood was overrun with an OUTBREAK. I still have not regained my sense of smell and taste and I am suffering from possible long-haul effects of the virus including frequent brain fog, inarticulation and an inability to concentrate. The Court should recognize that my medical condition, which now includes testing positive for COVID-19 and the threat posed by the

(11)

hew, more virulent and deadlier COVID-19 variants

pose to me given these long-haul effects, are

a significant factor warranting sentence reduction.

The benefits of keeping me in prison for the

remainder of my sentence are minimal and the

potential consequences of doing so are extraordinarily

grave. United States v. Barker, 2020 U.S. Dist.

LEXIS 83457, No. 6:18-CR-00446-AA ( D. Ore.

May 12, 2020); United States v. Perry, 2020 U.S.

Dist. LEXIS 57265, 2020 WL 1546422, at *4

(S.D.N.Y. Apr. 1, 2020).

24. It is undisputable that prisoners are

particularly vulnerable to infection due to the nature

of their incarceration. See Centers for Disease

Control and Prevention (CDC), Interim Guidence on

Management of Coronavirus Disease 2019 (COVID-19)

in Correctional and Detention Facilities,                    (12)

https://www.cdc.gov/coronavirus/2019-nCoV/

community/correction-detention/guidance-correctional-

detention.html. Specifically, prisoners are unable

to adequately follow social distancing and sanitary

guidelines recommended to avoid the spread of

infection. In my current unit ((Gregg B), these

sanitation concerns are exacerbated by the fact that

over 150 men share common sinks, toilets and

showers. The physical layout of this open-air

dormitory-like setting makes social distancing

impossible.

25. No doubt, the Government will detail the

efforts taken by the BOP in the face of the

COVID-19 crisis. The BOP put its "Action Plan"

in place, which comprises many preventitive

and mitigation measures; including: all inmates

are screened, and staff are regularly screened;          ⑬

contractor visits are limited to essential
services, while nearly all attorney, social, and
volunteer visits have been suspended; inmate movements
between facilities have been extremely limited; and
institutions are taking additional steps to impose
Modified Operations to maximize social distancing.

26 The Court has already seen the onerous
restrictions applied to inmates under Modified
Operations See EXHIBIT "B". These extremely
harsh conditions have been in place since January,
2020, at LSCI-Allenwood, and are indistinguishable
from punishment. Inmates are confined to cells for
24 hours a day in many cases, and when inmates
are allowed out of their cells, it is only for an
hour or two each day. Inmates have limited
access to showers, no television for months at a
time; are not allowed to sit in chairs inside ⑭

their cells; are offered an extremely limited commissary over extended periods of time; have had no access to Recreation or the Recreation Yard and the equipment there for over a year; have had no access or limited access to Psychology Services, Religious Services, and the Education Department — including the library where there are typewriters and copy machines that can be used to produce legal documents; law library access is limited in the units to "out of cube time" on a single computer terminal that can only accommodate one inmate at a time; no "work outs" are allowed inside the cells or within the unit — so inmates have not had meaningful exercise for over a year; and during LOCKDOWN, the prison serves frozen, pre-packaged, high-carbohydrate, "diabetes in a box" meals for weeks at a time composed of generic packages ⑮

of crackers, cookies, peanut butter and jelly.

27. The BOP's Action Plan has already been debunked by the Courts. In _United States v. Gorai_, 2020 U.S. Dist. LEXIS 72893 (D. Nev. Apr. 24, 2020), the court stated, at 6:

> "First, testing inside prisons has been scant except for people who self-report symptoms — which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals" _United States v. Esparza_, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020)

28. My own experience is revealing on this point. When the BOP says that inmates are "screened", that means merely temperature checks that are conducted 4 times per MONTH. Moreover, "Sick" inmates were taken to the SHU for isolation, so no inmates report any symptoms

(16)

because no inmate wants to be sick AND experience the DEATH-ROW-like conditions of the SHU. Moreover, no level of Modified Operations can magically change the Sanitation and social distancing deficiencies inherent to prison unit layout, particularly my unit - Gregg B.

29. Moreover, BOP stated policy is not the specific practice at its facilities My own experience at LSCI-Allenwood is relevant on this point. BOP staff at LSCI-Allenwood were quick to deviate from the stated Action Plan when dealing with inmates who were identified as sick. Instead of removing them immediately, the BOP staff "hid out" in their offices with the doors closed while infected inmates were allowed to mingle with non-infected inmates, the infected inmates being removed hours later at shift

change.

30. Additionally, the BOP staff at LSCI-Allenwood notoriously under-report or are late to report up-to-date, on-the-ground information about their facilities, particularly with respect to the COVID-19, information that is relied upon by the public, the media, and the courts. It literally took TWO WEEKS for the most recent OUTBREAK that began on December 5, 2020, to be reported in the numbers available at the BOP website: https://www.bop.gov/coronavirus. It was not until December 29, 2020, that the BOP website began reporting the full ramifications of the LSCI-Allenwood COVID-19 OUTBREAK of the initial strain of the virus.

31. Internal documents from LSCI-Allenwood about the latest COVID-19 OUTBREAK (EXHIBIT "A") (18)

show that by December 23, 2020, there were

hundreds of COVID-19 cases, as entire units had

tested positive for the virus and were in

quarantine status. This is in stark contrast

to how the Government and BOP Supervisory Attorney

Kerr - on the very same day - represented the

situation to the courts:

Consistent with BOP's systemic response,
FCI Allenwood Low has implemented a number
of additional protective and administrative
measures. According to BOP Supervisory
Attorney Jonathan Kerr, on December 5,
2020, an inmate from Gregg B housing-unit
reported to Health Services presenting with symptoms.
He was administered the Abbott ID Now
test with a positive result. All inmate presented
afebrile and asymptomatic; however, all of
Gregg B housing-unit were tested. As a
result, another 22 asymptomatic inmates in
Gregg B had positive results and are being
monitored closely by Health Services.
The entire institution is currently
locked down on quarantine status
for the foreseeable future. All meals,
pill line, etc., are conducted within the
housing-units and visitation is suspended

(19)

until further notice. There is no inmate movement on the compound, including work details. United States v. Gill, No. 5-16-CR-00382-FJS, Doc. 57, (N.D.N.Y. December 23, 2020)

32. If the Government's version of events is to be believed, on December 23, 2020, there were 23 asymptomatic inmates at LSCI-Allenwood who tested positive for COVID-19. This is at loggerheads with my own observations and the internal BOP documents produced from that exact date. Less than one-week later on December 29, 2020, the BOP website showed 493 completed COVID-19 tests and 186 positive tests. Unless the BOP Staff worked through Christmas (which they didn't), the BOP, the Government, and BOP Supervisory Attorney Jonathan Kerr were "sitting" on the true numbers and were very dishonest to the Court in the Gill case.

(20)

How many Judges relied upon these dishonest figures in deciding pending applications? And how will BOP Supervisory Attorney Kerr and the Government conspire to present information unfavorable to them with respect to the pending application? Can the BOP website be trusted at all?

33. What is abundantly clear is that the BOP has no coherent response to the COVID-19 OUTBREAK running through its institutions, including LSCI-Allenwood, and is reduced to misrepresenting figures to courts around the country — and the Government is complicit in this practice. Stunningly, after the recent OUTBREAK, the BOP's figures for LSCI-Allenwood on the BOP's website still shows that the number of "completed COVID-19 tests" is far less than the total number of inmates (which is ㉑

874 total inmates as of March 8, 2021).

Either the BOP is criminally negligent in reporting real-time, on-the-ground information, or there is a serious problem with the Action Plan and BOP's COVID-19 testing regiment. Why wouldn't every inmate at a correctional institution where there was admittedly an OUTBREAK be tested? And these issues will only grow worse once the new, more virulent and deadlier COVID-19 variants ravage their way through the FCC Allenwood Complex.

34. Additionally, this policy of misrepresentation of figures has real consequences for how the BOP dispenses care because the BOP publicly touts how it responds to OUTBREAK situations that it is forced to acknowledge. See https://www.bop.gov/resources/news/pdfs/20200505_press_release_lox.pdf 22

The BOP and the Government were quick to point out a Hospital Care Unit (HCU) that was built at FCI Lompoc to deal with the COVID-19 OUTBREAK at that institution. Maybe if the BOP was timely and honest about their figures, an HCU could have been built on the FCC Allenwood Correctional Complex to serve the thousands of inmates housed here, potentially avoiding the COVID-19-related deaths at the Allenwood USP and FCI.

35. BOP and Government chickenery aside, it is clear that my term of imprisonment has been much harsher than the Court ever intended at Sentencing. I have been living under LOCKDOWNS and Modified Operations for almost a year and a half, and no end is in sight as the COVID-19 remains a "national (23)

emergency" declared by the President and the
"covered emergency period" remains in effect. Proc.
9994, 85 Fed. Reg. 15, 337 (Mar. 18, 2020);
CARES Act § 12003(a)(2), 134 Stat. at 516.

36. The restrictions put in place during Modified
Operations and LOCKDOWN, while done for valid
penological reasons, undoubtedly cause the punishment
experienced to be much harsher than under normal
prison conditions. The United States Supreme
Court has called for heightened judicial scrutiny
of the projected impact of jail and prison
conditions on a defendant. Davis v. Ayala,
135 S. Ct. 2187, 2209 (2015) (Kennedy, J.,
concurring) Here, the impact is not projected,
but actual and experienced.

37. As I have detailed supra., and I am
sure the Government will exhaustively detail      (24)

in Opposition, the BOP and its Action Plan
has imposed onerous lockdowns and restrictions
on inmates for at least the past year. And it
is just these onerous measures that has made
the incarceration of prisoners far harsher than
normal. Restriction on family visits and gatherings;
quarantine LOCKDOWNS lasting for months; limited
access to basic things like showers, commissary, television
e-mail, and legal research; the suspension of
operations in the prison Education, Recreation,
Religion and Psychology Departments; the banning
of all outside personnel — including priests
and rabbis for religious services and counseling and
contractors to make needed repairs —
all of these restrictions are part of the
BOP's "Action Plan". And all of these
restrictions have made inmate life much harsher.    (25)

38. And courts have found these onerous and harsh prison conditions as an extraordinary and compelling reason warranting sentence reduction under 18 U.S.C. § 3582 (c)(1)(A) United States v. Rodriguez, No. 00 CR 761-2 (JSR), 2020 U.S. Dist. LEXIS 181004, 2020 WL 5810161, at *3 (S.D.N.Y. Sep 30, 2020) ("The pandemic, aside from posing a threat to [a defendant's] health, has made [a defendant's] incarceration harder and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners for harsher than normal."); United States v. Fernandez, 2020 U.S. Dist. LEXIS, 12-cr-844-1 (AJN) (S.D.N.Y. oct. 14, 2020); United States v. Lizardi, No. 11 CR (26)

1032 (PAE), Dkt. 2523 at 2, 2020 US. Dist.

LEXIS 188147 (S.D.N.Y. Oct. 9, 2020)

39. I submit that I am a prime candidate

for sentence reduction because of the harsh prison

conditions I have experienced during my incarceration

and the fact that I have completed over 75%

of my prison term. See the attached EXHIBIT "E".

The court in Lizardi found that after only

seven (7) months of punishing prison conditions,

the defendant, who was convicted in his involvement

in a gang murder, should be given compassionate

release. There is no end to the harsh conditions

in sight, and I haven't killed anyone. I

request the Court gives this factor weight in its

determination because I have served a substantial

portion of my prison term and have done so

without incident. Interestingly, the only                    (27)

disciplinary "shot" I have recieved in BOP

custody was for failing to wear a mask - a [walk to the Rec Room or 10 second]

300-level shot that was imposed shortly after

I made my internal administrative request

for compassionate release / sentence reduction.

I had my commissary privileges taken away for 30

days as a sanction.

40. Additionally, I advance the argument that

I was sentenced to an overly-long sentence driven

by the mandatory minimums in this case. The

Court has authority to depart from these mandatory

minimums based upon the statutory authority

granted under 18 U.S.C. §3582(c)(1)(A) and the

wide discretion confirmed by the Third Circuit in

Pawlowski. Aside from the sentencing disparity

issues raised, it should be noted that the same

conduct that formed the basis of the federal    (28)

prosecution was the basis for a state prosecution

by Pennsylvania. Prior to the case being "picked-up"

by the Feds, I was facing less than a year

in state prison and had a verbal agreement

for a disposition of six months probation.

41. Without question, mandatory minimums, like the one

in this case, have "handcuffed" Judges at Sentencing.

See United States v. Harris, 2021 U.S. Dist.

LEXIS, No. 2:15-CR-00083-RAJ (W.D. Wa. Jan,

(9, 2021). Judges have used the statutory authority

under 18 U.S.C. § 3582 (c)(1)(A) to correct

overly-long sentences driven by mandatory minimums,

which only lead to unwarranted mass-incarceration.

See the attached EXHIBIT "F".

42. Additionally, I have engaged in substantial

rehabilitation while in the prison environment,

albeit severely limited by Modified Operations and    (29)

the limited offering of applicable programming at

LSCI - Allenwood. My latest Team Review / Individualized

Needs Plan shows that I have completed well over

10 BOP educational courses. See the attached

EXHIBIT "G". These LSCI- Allenwood courses

are in addition to the substential course work

that I completed while on inmate at FCI - Otisville,

prior to my transfer to LSCI - Allenwood. See

the attached EXHIBIT "H" Compared to FCI - Otisville,

LSCI - Allenwood has an extremely limited educational /

rehabilitation offering and does not produce completion

certificates for inmates

43. Accordingly, the Court should find the

combination of factors that I have advanced supra,

constitue "extraordinary and compelling" reasons

pursuant to 18 U.S.C. § 3582 (c)(1)(A)

Warranting sentence reduction.                                    � 30 ⟩

## I AM NOT A DANGER

44. To the extent that the U.S.S.G §1B1.13

and the related policy statements are inapplicable, the

dangerousness analysis under 18 U.S.C. §3142 (g) is

no longer applicable to motions for sentence

reduction under 18 U.S.C. §3582 (C)(1)(A).

However, since the concerns are duplicative of

those expressed in 18 U.S.C. §3553(a)(2)(C),

which the Court is bound to consider. (United

States v. Easter, 975 F.3d 318 (3d Cir. 2020)),

I will address the concerns of my dangerousness to

the community or to any person. The factors

to be considered are: whether the crime of conviction

is a crime of violence, the weight of the evidence,

and the nature and seriousness of danger to any

person or the community posed by my release.

45. My crime of conviction is not categorically    (31)

a crime of violence. The entire transaction involving the 17 year, 11 month-old individual was less than $200. The gravamen of my crime for which I was sentenced to ten (10) years imprisonment was that I failed to ask for identification from her for something that she wanted to do. If she were days older, my conduct would not have been a federal crime subject to a 10-year mandatory minimum. My actions were not violent, and amount to a lapse in judgment and a clerical error with no coercion, persuasion or threats that are even alleged.

46. The weight of the evidence is similarly problematic and would not withstand serious scrutiny under U.S.S.G. § 6A1.3(a). At no point was a minor ever intended to be involved, and only became involved when the minor's friend, working as a law enforcement informant, convinced her friend to join her in prostitution and ③②

sent her to my house in her stead. The Government's own discovery papers showed the informant did this with full pre-knowledge of law enforcement. I merely wish to remind the Court of my contention that this was a game of "gotcha" from the beginning. A failure to ask for identification and misplaced trust in an informant are responsible for a minor's involvement, not intent on my part.

47. I am not a danger to the Community or to any person. The BOP has characterized my risk of violence as MINIMUM in its PATTERN RISK SCORING analysis. See the attached EXHIBIT "I". The Government would be hard-pressed to offer any evidence to the effect that I am a danger to the community or to any identifiable person, and they cannot offer

(33)

any argument on this point unless the

Government wishes to de-legitimalize the BOP's

program of inmate rehabilitation and the

PATTERN RISK SCORING analysis.

### THE 18 U.S.C. § 3553 (a) FACTORS
### FAVOR SENTENCE REDUCTION

48. Consideration of the applicable factors from

18 U.S.C. § 3553(a), as also required by 18 U.S.C.

§ 3582 (c)(1)(A) and United States v. Easter,

975 F.3d 318 (3d Cir. 2020), leads to the

conclusion that a sentence reduction at this time

is warranted. In short:

(a) The "nature and circumstances of the offense,"

§ 3553(a)(1), are known to the Court and will undoubtedly

be detailed ad nauseum in the Government's Opposition.

The points to remember are that the Government will

not go out of its way to point out that the

(34)

female involved in this case was ~~being~~ weeks away

from her 18th birthday, the transaction in

question was less then $200.00, and the conduct

of Pennsylvania state law enforcement in this matter

can only be characterized as outrageous governmental

conduct. At this point, the Government's actions

should be a search for the truth, not a campaign of

misinformation. See Strickler v. Greene, 527

U.S. 268, 281, 119 S.Ct. 1936, 144 L.Ed

286 (1999) (recognizing "the special role played

by the American prosecuter in the search for truth in

criminal trials.") Within the Federal System, The

United States Attorney is "the representitive not of

an ordinary party to a controversey, but of a

sovereignty whose obligation to govern impartially

is as compelling as its obligation to govern at all;

and whose interest, therefore is not that it    (35)

shall win a case, but that justice shall be

done." Berger v. United States, 295 U.S. 78, 88,

79 L.Ed 1314, 55 S.Ct 629 (1935).

(b) The "Characteristics of the defendant," §3553(a)(1),

now include the fact that I have contracted the COVID-19

with complications, the experience of harsh prison

conditions experienced to date and expected to be

further experienced based on the BOP's response

to the new COVID-19 variants, and my substantial

rehabilitation inside prison. They also now include

my life-long tag as a felon, closing the doors to

substantial opportunities. That I have experienced

harsh punishment and will continue to experience

punishment upon release is certain.

(c) Pursuant to §3553(a)(2)(A), the service of

nearly 80% of my sentence, in combination with the

significant asset forfeiture of my house and my  (36)

(as based on a $200.00 transaction, and the collateral consequences of felony conviction fully reflects the seriousness of my offense, promotes respect for the law, and provides just punishment for the offense. The collateral consequences of a felony conviction are well-recognized. See generally, American Bar Association, https://www.aba.collateralconsequences.org, United States v. Nesbeth, 188 F, Supp. 3d 179, FN 32 (E.D.N.Y. 2016). I have restrictions or prohibitions to my access to the most basic rights and privileges, and I am subject to substantial hurdles in future employment. Id at FN 4).

(d) Pursuant to § 3553 (a)(2)(B), the already-served sentence, being harsher than anyone could have foreseen at sentencing and the outlandish asset forfeiture suffered in relation to a $200.00 transaction, along with the collateral consequences    (37)

of felony conviction provide adequate specific
deterrence to me and general deterrence to would-be
offenders. It appears to be primarily in the certainty
of punishment, not its severity, that deterrent
power lies. See Steven N. Durlaf & Daniel S. Negin,
Imprisonment and Crime: Can Both be Reduced? 10 Criminology
& Pub. Policy 13, 37 (2011); United States v. Bannister,
786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011). I am
specifically deterred by the certainty of the life-long
aspects of my punishment and the fear that I may
be much more easily re-incarcerated for longer
periods of time in the future.

   (e) Pursuant to § 3553(a)(2)(C), I am not
a danger, and the public is protected from any
of my would-be future crimes by my monitoring
by the U.S. Probation Office and the fact
that I have no previous ^felony criminal record,    (38)
                 except 2 misdemeanor DUIs.

Incidentally, the U.S. Probation Office has interposed an Internet monitoring condition that the Court did not believe appropriate at Sentencing. I would ask that the Court remove the Internet Monitoring condition as part of the relief requested herein.

(f) Considerations of providing needed medical care and treatment, a stated in § 3553(a)(2)(D), suggests release rather than incarceration. The BOP identified my serious dental issues in 2017 and 2018 and they are listed as "current" under my BOP Health Problems Report. See the attached EXHIBIT "J". It has been FIVE (5) years and I still have not received dental treatment despite numerous requests. See the attached EXHIBIT "K", I need a root canal, which the BOP will not address. Moreover,  ③⑨

I have a lypoma on my head, a huge mass protruding on my shaved head, that I have had to live with for my entire time in incarceration because the BOP has refused to remove it or even biopsy it, despite the numerous requests made. If I am released, I can have this pre-cancerous (or perhaps cancerous) growth removed. This factor favors my immediate release.

(g) Given all the facts and circumstances discussed herein, a reduction in sentence is not inconsistent with the need to avoid unwanted sentencing disparities and is actually consonant with the disparity between the mandatory-minimum imposed federal sentence and the state-based penalty for the same conduct under Pennsylvania law. As stated in <u>United States v. Bellamy</u>, 2019 U.S. Dist. LEXIS 124219 (D. Minn), at 19, "... any disparity resulting from a reduced sentence is not unwarranted (40)

given the special circumstances [defendant] faces
in prison".

(h) I have no restitution owed in this
case. § 3553(a)(7).

(i) Finally, upon consideration of the overall
statutory command that all sentences, while sufficient
to achieve the objectives identified in subsection
(a)(2), are not "greater than necessary," the
sentence in this case should be reduced because
further incarceration is greater than necessary.

## I HAVE A STRONG RELEASE PLAN

49. I have a strong release plan that will ensure
success. If released, I will live with
Aaron Rissinger, a life-long friend, and his
wife at their home in the Harrisburg, Pennsylvania
area at an address known to the BOP.
Aaron and his wife have been supportive of me     (41)

and Aaron has handled my affairs while I have been incarcerated, and he continues to be supportive. If released, he can help arrange transportation from LSCI-Allenwood. New CDC regulations reveal that I am not a person required to quarentine, but if one is required, it can be done at Aaron's home in the Harrisburg, Pennsylvania, area. Upon release, I will obtain valid medical benfits nd other available assistance until such time as I can secure employment.

## MISCELLANEOUS POINTS

50. I would remind the Court that my Plea Agreement conterned a waiver that allowed for re-sentencing if the applicable statute in the instant case changed in any way. I would argue that 18 U.S.C. § 3582(c)(1)(A) gives new statutory authority for the Court to refashion my punishment and grant me sentence reduction as previously contemplated.    (42)

51, I also ask that the Court reviews the additional conditions imposed by U.S. Probation that were not specifically imposed by the Court at Sentencing, including Internet monitoring, and remove any conditions that the Court finds inappropriate in this case.

<u>CONCLUSION</u>

52. For the reasons stated herein, the Court should grant the instant application pursuant to 18 U.S.C. § 3582(c)(1)(A), granting sentence reduction and all relief requested herein.

WHEREFORE, the defendant, COY KLINGER, respectfully requests that this Honorable Court grants the following relief:

(A) Telephonic presence at any motion conference; and

(B) Immediate sentence reduction/Compassionate release to time served pursuant to 18 U.S.C. § 3582(c)(1)(A); and

(C) Immediate release from the custody of the (43)

Federal Bureau of Prisons and from the facility:
Low Security Correctional Institution - Allenwood, in
White Deer, Pennsylvania; or in the alternative,

(D) Sentence reduction of the instant term of
imprisonment to a term that the Court shall deem just;
and,

(E) Removal of conditions of Supervised Release imposed
by the U.S. Probation Office for the Middle District of
Pennsylvania that were not imposed by the Court and
that the Court shall deem unnecessary on the instant
case, including but not limited to: Internet
monitoring; and

(F) Such other and further relief as the Court
shall deem just and equitable,

Dated: White Deer, PA          Respectfully submitted,
        March   , 2021

                    COY KLINGER*

* Signed under the penalties of perjury contained in Title 18
of the U.S. Code,

44



Cor Klinger-72313-067
Federal Correctional Complex - Allenwood Low
P.O. Box 1000
White Deer, PA 17887

Clerk of Courts
228 Walnut Street
Harrisburg, PA 17108
Attn: Judge John Jones III

PRIORITY MAIL

US POSTAGE PAID
$0.00
Retail
Origin: 17887
03/31/21
4192008987403

PRIORITY MAIL 1-DAY®

0 Lb 15.20 Oz
1005

C000

EXPECTED DELIVERY DAY: 04/01/21

SHIP
TO: 228 WALNUT
Harrisburg PA 17108-2586

USPS TRACKING® #

9505 5135 2176 1090 2514 49